**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| AFH HOLDING & ADVISORY, LLC, AMIR HESHMATPOUR, STEVE RICHARDS, AND DR. BESSIE (CHIA) SOO, )<br><br>Plaintiffs, )<br><br>v. )<br><br>BRUCE STOEVER, an individual, JOHN BOOTH, an individual, DONALD R. HANKEY, SR., an individual, BRET HANKEY, an individual, JAMES DELSHAD, an individual, and THE MUSCULOSKELETAL TRANSPLANT FOUNDATION, INC., a District Of Columbia corporation, and HANKEY CAPITAL LLC, a California limited liability company, )<br><br>Defendants, )<br><br>BONE BIOLOGICS CORPORATION, a Delaware corporation, )<br><br>Nominal Defendant. ) | **CIVIL ACTION NO. 1:18-CV-11612-ADB**<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**FILING ORDERED JANUARY 4, 2019** |

Plaintiffs AFH Holding & Advisory, LLC ("AFH"), Amir Heshmatpour, Steve Richards, and Dr. Bessie (Chia) Soo, (collectively, "Plaintiffs"), stockholders of Bone Biologics Corporation (hereinafter "BBC" or the "Company"), by and through their attorneys, allege as follows upon information and belief, except where stated as to personal knowledge:

**NATURE AND SUMMARY OF THE ACTION**

1.      This is a class action brought by Plaintiffs on behalf of themselves and a Class of public holders of common stock of BBC (the "Class," defined below at ¶¶ 51-52), against BBC's

Board of Directors (the "BBC Board" or the "Board"), every member of the Board,[1] The

Musculoskeletal Transplant Foundation, Inc. ("MTF"), Hankey Capital LLC ("HC"), and BBC

itself.

2.      Plaintiffs, on behalf of themselves and the Class, seek damages and injunctive

relief from Defendants, arising out of Defendants' multiple willful and/or other serious breaches

of their fiduciary duties and violations of federal and state securities laws, as set forth herein.

3.      This action concerns the wrongful, unfair and oppressive conduct of the Board

and controlling stockholders of BBC in connection with a grossly unfair, inadequate and fatally

flawed (in terms of both price and process) change of control transaction (the "Transaction") in

June of 2018, in which Don Hankey and the Hankey Stockholders took  control of the Company.

As a result of the Transaction, the Hankey Stockholders' interest in the Company skyrocketed

from a pre-Transaction stake of about 19% to a post-Transaction eighty-plus percentage stake.

As another consequence of the Transaction, Plaintiffs and the Class suffered material harm,

severe dilution and loss of value of their BBC investments..

4.      The Defendants unfairly foisted the Transaction upon the Plaintiffs and the Class

against their will and without adequate notice.   Class members were forced to accept grossly

inadequate value in the place of their prior BBC investments as the result of a fundamentally

unfair and inadequate sale "process" involving, among other things, secret and predetermined

deal negotiations and stockholder votes.

5.      This "process" was really the equivalent of a kabuki-dance wrought by material

conflicts of interest and numerous other flaws which are ultimately fatal to its legitimacy and

---

[1] The current members of the BBC Board include: Don R. Hankey, Sr. ("Don Hankey"), his son Bret Hankey, Stephen LaNeve ("LaNeve"), and John Booth ("Booth").   Stroever, LaNeve and Booth are designees of MTF.   MTF, Stroever, LaNeve and Booth, may be collectively referred to herein as the

compel significant redress to the injured Class members, as described herein.  For these and other reasons, Defendants bear the burden of proving the entire fairness of the Transaction.

6.       BBC is a biotech startup company with a valuable flagship product in development that is making substantial progress and is on the verge of prospering.  This product is a recombinant human protein growth factor essential for normal bone development called NELL-1.  NELL-1 is a powerful specific bone and cartilage reformation product, which provides regulation over skeletal tissue formation and stem cell differentiation during bone regeneration.  NELL-1 was discovered in 1995 and isolated in 1996 by Dr. Eric Kang Ting (DMD, DMSc/Professor, University of California Los Angeles ("UCLA") Dental School), NELL-1 and its related patents were developed thereafter by Dr. Ting, Plaintiff Dr. Soo, and Dr. Benjamin Wu (DDS, PhD/Chair and Professor, UCLA Department of Bioengineering).   These three individuals may be referred to collectively herein as the "Founders."

7.      ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████

8.       NELL-1 is the subject of numerous issued patents owned by University of California Regents ("UC Regents"), with more than 175 claims, covering molecular structure/composition, manufacturing process (NELL-1 protein expressed in mammalian & other systems), and "field of use" (use for promoting bone growth).  BBC has obtained, through a technology transfer from UCLA Technology Development Group ("UCLA TDG") on behalf of

_____

█████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████
████████████████████████████████████████████

the UC Regents, exclusive worldwide license to NELL-1 technology from UCLA for domestic and international spinal fusion, osteoporosis treatment and trauma treatment.  Separately, these are all multi-billion dollar markets at present, and each is projected to grow significantly in the next five to seven years.

9.      In sum, handled correctly, NELL-1 (and, in turn, BBC) have tremendous value value which is in the process of coming to fruition.  Defendants themselves have repeatedly recognized this, even up until the present, and despite their enabling the Hankey Stockholders to obtain an overwhelming majority stake in BBC at a steep discount via the June 2018 Transaction.

10.     Prior to the Transaction, Defendant MTF was BBC's largest stockholder (at approximately 35%) and a controlling stockholder.  MTF has been BBC's largest funder, invested about $12 million through 2018, and installing its designees in numerous executive management positions and Board seats (including both the pre-Transaction CEO and the Chairman positions).  At the time of the Transaction, MTF held majority control of BBC's Board (three of five directors, Stroever, LaNeve and Booth) and dominated BBC's management (designees holding positions of CEO, COO and CFO).

11.     MTF (both alone and in conjunction with Hankey and the Hankey Stockholders, including BBC director Bret Hankey, who voted in favor of the Transaction) therefore controlled and dominated the business and operational affairs of BBC.

12.     On June 12, 2018, BBC filed a Form 8-K filed with the U.S. Securities and Exchange Commission ("SEC") (the "June 12, 2018 8-K") disclosing for the first time that BBC and HC had entered into a Securities Purchase Agreement ("Purchase Agreement") on June 11, 2018.  Under the Purchase Agreement, HC was to buy up to 3,869,979 shares of BBC common

stock at a purchase price of $1.00 per share, and up to $2 million in a convertible secured Note. The June 12, 2018 8-K further disclosed, for the first time, that the closing of the Purchase Agreement was "conditioned on the completion of a reverse split of a ratio of 1 for 10 of the Company's outstanding common shares" (the "Reverse Split").   In effect, the Transaction enabled Hankey to obtain an overwhelming majority and controlling interest in BBC for approximately $5 million, a small fraction of its true worth.

13.     However, the June 12, 2018 8-K gave no indication at all that the Reverse Split, including both the Board vote and the majority stockholder vote thereon, had already taken place four days ago, on June 8, 2018.  Thus, unbeknownst to Plaintiffs or the Class, by June 12, 2018, the Reverse Split "condition" to the Purchase Agreement was already a *fait accompli*.

14.     Both the Preliminary and the Final Schedule 14Cs (the latter filed with the SEC on June 25, 2018) represented that the Defendants, as holders of a majority controlling interest in the Company's equity, need not provide BBC's other minority non-controlling stockholders (*i.e.,* Plaintiffs and the Class) with prior notice of, or an opportunity to participate in or object to, the Reverse Split or the Transaction.   Hiding behind this technicality, Defendants thus failed to provide proper prior notice to the Class that the decisions and votes critical to the Transaction were taking place.

15.     On July 19, 2018 the Company filed a Report on Form 8-K with the SEC, disclosing for the first time that "effective July 16, 2018, the Company and [HC] had entered into an amendment to the Securities Purchase Agreement dated as of June 11, 2018 providing for a $2 million credit facility from HC to the Company in lieu of the earlier announced $2 million loan, and announcing the issuance of shares to HC pursuant to the Purchase Agreement.   The

July 19, 2018 Form 8-K announced for the first time that Don Hankey "acquired control of the Company," and would immediately become a director and the Chairman of the Board of BBC.

16.    The Board members who reportedly voted in favor of the Transaction were Brett Hankey (designated to the Board by HC), and Stroever, LaNeve and Booth (all designated to the Board by MTF).

17.    The Company's SEC filings in connection with the Transaction were materially false and misleading and contained a number of false and misleading statements and omissions, as detailed below at ¶¶ and elsewhere herein.

18.    For instance, The June 25, 2018 Schedule 14C represented that the Reverse Split "affect[ed] all of [BBC's] common stockholders uniformly . . .."[3]  This was materially false and misleading because it failed to explain that as a result of the re-pricing of the prior convertible notes issued to HC, combined with the Purchase Agreement and additional note, Don Hankey and HC, the Hankey Stockholders, would increase their percentage ownership of the Company enormously, to a staggering stake of over eighty percent 80% of BBC, thereby obtaining control and simultaneously severely diluting the other minority stockholders' (*i.e.,* the Class).

19.    This claim that all of the stockholders would be treated or affected "uniformly" was a particularly egregious misrepresentation in light of the overall Transaction and all of its parts, including the Reverse Split.  This self-serving statement simply is not borne out by the circumstances or the actual results and disparate and inordinately negative impact of the Transaction on the minority BBC stockholders in the Class.

20.    MTF has also relied on this fiction as well to attempt to excuse its own conduct herein, but this argument vis-à-vis MTF is at best only superficially appealing.  In truth, MTF

---

[3]  https://www.sec.gov/Archives/edgar/data/1419554/000149315218009146/def14c.htm   (at  p.  5)  (last visited January 10, 2019).  The June 12, 2018 Preliminary Schedule 14C made this representation as well.

secured tremendous potential benefits from the Transaction that were and are not available to Plaintiffs or the Class.

21.     MTF owns and controls a product called DBX®, a proprietary form of demineralized bone matrix (DBM), that can essentially function as a "companion product" to NELL-1.  Generally, DBM is the most popular form of what is purported to be osteoinductive bone, which is used primarily as a "graft extender."  MTF's DBX® is one of a range of DBM products currently approved by the Food and Drug Administration ("FDA") for clinical use.

22.     MTF stands to gain tremendous benefits from the use of NELL-1 and DBX® in combination, as what it has termed a "fusion device."[4]  MTF recently observed that "[t]he global orthobiologics market is valued at approximately $3 billion in 2016 and growing at mid-single digit growth rates," and stated its belief that "[w]hile the product is initially targeted at the spine fusion market, . . . the NELL-1/DBX fusion device's unique set of characteristics including target specific mechanism of action, efficacy, safety, and affordability position the product well for application in a variety of procedures," including in the market for "non-union" trauma treatment ("[t]he NELL-1/DBX fusion device is expected to perform as effectively as high-priced growth factors in this market"), and the "hip & knee reconstruction" market ("a substantial opportunity for the NELL-1/DBX fusion device.").

23.     Historically, MTF was BBC's single largest provider of funding, having invested approximately $12 million into BBC by 2017, hence its status as a BBC controlling stockholder prior to the Transaction.  However, upon information and belief, MTF's investment in BBC had become significantly larger than its typical investment in biotech startups.  Thus MTF's

---

[4] A NELL-1/DBX® combined product would fall within a category of "combination products" that would be regulated by the FDA. *See* https://www.fda.gov/RegulatoryInformation/ Guidances/ucm122047.htm ("Combination Products Guidance Documents") (last visited January 9, 2019).

willingness to provide further funding to BBC was reaching, indeed had already reached, its

end.[5]  (Emphasis

added).

25.

BBC's website also describes MTF as

its "Strategic Partner" and states that "[w]e anticipate that MTF, with its proven ISO 901

manufacturing and packaging of FDA approved osteogenic carriers, will significantly accelerate

the clinical development cycle of NELL-1 related products," a category obviously including

DBX®.[6]

26.    Because MTF had already surpassed its investment limits with respect to BBC,

MTF was eager, if not desperate, for another large *and* friendly, investor (and a more malleable

one, given a lack of expertise or experience investing in that particular space) to take over as the

lead financier of BBC and NELL-1; Hankey and his affiliates provided the solution to this

---

[5] Upon information and belief, MTF often makes investments in promising biotech startup companies, but its funding commitment on average is more typically in the range of approximately $2 million to $3 million. MTF substantially exceeded this amount with its investments in BBC.

[6] http://bonebiologics.com/about/strategic-partners/  (last visited January 10, 2019)

problem for MTF, as well as the critical safeguard MTF needed going forward for the renewed life and increased profit potential that BBC/NELL-1 meant for DBX®.

27.     In conversations just before the Transaction was commenced in June of 2018, Defendant Stroever directly admitted in face-to-face conversations with Plaintiff Heshmatpour that MTF was not particularly concerned with maximizing its direct equity investment in BBC, as long as the renewed potential for DBX® offered by NELL-1 and BBC was ensured protection going forward.   Accordingly, the dilution of its direct equity interest in BBC was of minimal concern to MTF; far more important was securing additional funding for BBC from a malleable investor to protect the "DBX – NELL 1 Connection."

28.     Defendants failed to provide even the most basic procedural protections for the Class in connection with the Transaction.  Defendants refused to establish a special committee of independent directors to actually negotiate with Hankey and vet the terms of the Transaction. Defendants refused to require a "majority of the minority" independent stockholder vote provision to ensure that the Class's interests were protected in this heavily conflicted change-of-control Transaction.

29.     Defendants also refused to obtain an independent fairness opinion or retain an outside financial advisor to opine that the Transaction was fair from a financial perspective to the minority, non-controlling stockholders such as Plaintiffs and the rest of the Class.  Shockingly, one individual Defendant even suggested outright that an outside fairness opinion would be unnecessary and useless, because whatever amount Don Hankey was willing to offer must *ipso facto* be fair and reflect fair value.

30.     Defendants also allowed Bret Hankey (Don Hankey's son, with ties to HC) to vote in favor of the Transaction, despite his obvious material conflicts, instead of requiring him to abstain from voting or even erecting a firewall between him and the Transaction.

31.     In sum, the Transaction was the culmination of a corrupt conspiracy and improper self-dealing by BBC's controlling stockholders, Defendants MTF and Hankey (and their respective affiliates).  Each achieved their respective goals by ramming through the Transaction and diluting and damaging the Class members' interests in doing so.  Hankey obtained a controlling equity interest in BBC and the accompanying substantial increased upside potential, and MTF received the assurance of the renewed/increased profit potential of DBX® going forward.  Therefore, both derived substantial benefits not enjoyed by the Company's other, minority and non-controlling stockholders (*i.e.,* the Class).

32.     As controlling stockholders of the Company, MTF and Hankey (and his affiliates) owed fiduciary duties to the Company's other, minority stockholders (including Plaintiffs and other Class members) not to use their controlling positions and influence to wrongfully benefit themselves or others at the expense of the Company or its other minority stockholders.

33.     Because MTF and Hankey and his affiliates stood on both sides of the Transaction and set it in motion, allowing it to proceed and forcing and ensuring its approval and consummation, the Defendants bear the burden of proving the entire fairness of the Transaction, including all aspects of its negotiation, structure, price and process.

34.     For these and other reasons, as set forth herein, Defendants have violated their fiduciary duties of loyalty, good faith, fair dealing, candor, and due care (and/or aided and abetted those fiduciary breaches).  Accordingly, Plaintiffs seek relief for their harm in the form of injunctive relief and/or money damages as a result of the violations of law alleged herein.

## JURISDICTION AND VENUE

35.     This Court has jurisdiction over the Defendants pursuant to 28 U.S.C. § 1331 because the claims asserted herein arise under § 14(a) of the Securities Exchange Act of 1934 ("Exchange Act") and Securities and Exchange Commission ("SEC") Regulation 14c-6 promulgated thereunder.  The Court has exclusive jurisdiction under § 27 of the Exchange Act, 15 U.S.C. § 78aa.  The Court also has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiffs' state law claims.

36.     This Court has personal jurisdiction over Defendants because, among other things, BBC maintains and/or maintained principal executive offices in the State of Massachusetts, and because BBC and/or the other Defendants transact and/or transacted business within Massachusetts, and the wrongful conduct alleged herein took place within Massachusetts. The exercise of jurisdiction by this Court is permissible under traditional notions of fair play and substantial justice.

37.     Venue is proper herein pursuant to 28 U.S.C. § 1391(b)(2) because, among other things, a significant portion of events from which the claims arose took place in this district.

## THE PARTIES

38.     Plaintiff AFH Holding & Advisory LLC is a Delaware limited liability company, and a minority stockholder of BBC.

39.     Plaintiff Amir Heshmatpour is an individual minority stockholder of BBC. Amir Heshmatpour is the controlling party of Plaintiff AFH.  Mr. Heshmatpour is a member of the Board of Advisors for the UCLA Anderson School of Management's Price Center for Entrepreneurship and Innovation.

40.     Plaintiff Steve Richards is an individual minority stockholder of BBC.  Mr. Richards is the founder and CEO of Endurance Media and was previously the President of Silver

Pictures from 2005 to 2017.   Mr. Richards is a member of the Board of Advisors for the UCLA Anderson School of Management's Price Center for Entrepreneurship and Innovation.

41.     Plaintiff Dr. Bessie (Chia) Soo is an individual minority stockholder of BBC.   Dr. Soo is a Professor in the UCLA Department of Orthopedics and a Professor and Vice Chair for Research in the UCLA Division of Plastic and Reconstructive Surgery.  She graduated from UCLA magna cum laude with an undergraduate degree in biology, and from UCLA and a medical in 1993 with election to Alpha Omega Alpha, the prestigious national medical honor society. Dr. Soo was certified by the American Board of Plastic Surgery in 2005 and made a Fellow of the American College of Surgeons in 2007.  Dr. Soo is one of the world's foremost experts on the NELL-1 protein, and has authored over 100 peer-reviewed publications on musculoskeletal regeneration, cutaneous repair, and translational applications of stem cells.  Dr. Soo has invented over sixteen (16) patents in the area of regenerative medicine, and is an expert on large and small translational animal models for device, combination product, and drug development.[7]  Dr. Soo was one of the founders of BBC and served as a member of BBC's Board of Directors from 2014 to April 2017.  Dr. Soo and Dr. Kang Ting, another of BBC's founders, are married.

42.     Defendant BBC is a Delaware corporation with principal executive offices at 2 Burlington Woods Drive, Suite 100, Burlington, Massachusetts 01803.

43.     Defendant Bruce Stroever ("Stroever") is a director of BBC and one of MTF's designees on the BBC Board.  Stroever served as the Chief Executive Officer of BBC until June 28, 2018, and also served as the Chairman of BBC's Board from 2012 through mid-2018.

---

[7] Dr. Soo is also a standing member of the prestigious Musculoskeletal Tissue Engineering Study Section at the National Institutes of Health (NIH) and she continues to be and has been a principal investigator on numerous awards funded by the NIH, the Department of Defense (DOD), the California Institute of Regenerative Medicine (CIRM), and most recently, the Center for Advancement of Science in Space (CASIS, which is the sole manager of the International Space Station U.S. National Laboratory).

Stroever was until very recently a longstanding executive of MTF, joining MTF in 1988, becoming MTF's President in 1992 and its CEO in 1996, and retiring in mid-2018 from both positions.

44.     Defendant John Booth ("Booth") is a director of BBC and a designee of MTF.

45.     Defendant Stephen LaNeve ("LaNeve") is a director of BBC and a designee of MTF.

46.     Defendant James Delshad ("Delshad") is a former director of BBC.

47.     Defendant Don. R. Hankey, Sr. ("Don Hankey") is a director and the Chairman of the Board of BBC.   Pursuant to the terms of the Transaction, Don Hankey, in addition to becoming the Company's controlling stockholder, was immediately elevated to Chairman of the Board (replacing Stroever).[8]  According to BBC's filings with the SEC, Don Hankey "is a non-independent board member."   Don Hankey is the CEO/Chairman, of the Hankey Group of Companies (hereinafter the "Hankey Group"), has been the manager of Hankey Capital, LLC, since its formation in 2002.   Don Hankey serves as the CEO of both the Hankey Group of Companies and the Hankey Investment Company, LP, and serves as Chairman of all Hankey Investment-controlled entities.[9]

48.     Defendant Hankey Capital LLC ("HC") is a California limited liability corporation with principal executive offices at 4751 Wilshire Blvd, Suite 110, Los Angeles, California 90010.  Notably, BBC's filings with the SEC describe Don Hankey as "[t]he President

---

[8] http://compliance-sec.com/secfilings/company/bonebiologics/link_files/2018/07-19-2018/Form_8-K(07-19-2018)BoneBiologics,Corp/Form8-K.pdf (at p. 2)

[9] The Hankey Group reportedly comprises seven primary operating entities companies with over $9.5 billion in assets, encompassing the following industry sectors" automotive (Midway Auto Group; North Hollywood Toyota), automotive finance (WestLake Financial Services; HFC Acceptance, LLC), insurance (Knight Insurance Group), real estate (Hankey Investment Company), and technology (Now.com).

of HC" and states that he is "a non-independent board member and a significant shareholder." HC is advertised as a private direct lender originating secured bridge financing in the range of two million to over 100 million dollars, as well as structured financing solutions (including Debtor-in-Possession financing). Currently, HC claims over $850 million in loans on its balance sheet. HC is owned by the Hankey Investment Company, which reportedly owns over 1.5 million square feet of commercial property or urban development land in Southern California with an aggregate current value of over $1 billion. Both HC and Hankey Investment Company are under the umbrella of the Hankey Group of Companies, of which Don Hankey is Chairman.

49.     Defendant Bret Hankey ("Bret Hankey") is a director of BBC and the son of Don Hankey. Since 2000, B. Hankey has served in various executive roles within the Hankey Group currently serves as its President, and as a director of all Hankey Group operating companies.

50.     Defendant MTF is a District of Columbia corporation with principal executive offices at 125 May Street, Suite 300, Edison, New Jersey 08837.

## CLASS ACTION ALLEGATIONS

51.      Plaintiffs bring this action on behalf of themselves and as a class action under Rules 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all other persons and entities who owned or controlled BBC common stock at the time of the Transaction, and were diluted by the Transaction or any portion or element thereof, and damaged thereby.

52.     Excluded from the Class are: (1) Defendants; (2) members of the immediate families of the Defendants; (3) the subsidiaries and affiliates of Defendants; (4) any person or entity who is a partner, executive officer, director or controlling person of one of the Defendants,

or any of its subsidiaries or affiliates; (5) any entity in which any Defendant has a controlling interest; (6) Defendants' liability insurance carriers, and any affiliates or subsidiaries thereof; and (7) the legal representatives, heirs, successors and assigns of any such excluded party.  The members of the Class are so numerous that joinder of all members is impracticable.  As of May 1, 2018, BBC reportedly had approximately 44 million shares of common stock issued and outstanding.

53.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests that are adverse or antagonistic to the Class.

54.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impracticable for Class members individually to seek redress for the wrongful conduct alleged herein.

55.     Common questions of law and fact exist as to all members of the Class, and predominate over any questions affecting solely individual members of the Class.  Questions of law and fact common to the Class are, among others:

(a)     Whether the federal securities laws were violated by Defendants' conduct as alleged herein;

(b)     Whether BBC's Schedule 14C filings and other filings with the SEC, and the documents incorporated therein, contained material misstatements or omitted to state material information;

(c)      whether the Individual Defendants breached their fiduciary duties to the Class by entering into the Transaction, which is materially unfair to the Class members;

(d)     whether the Transaction or any element thereof is unfair to the Class, in that the effect of the Transaction was the material dilution and diminution of the value of Class

members' investments in BBC so that it does not reflect the fair value or proper proportions of those investments under the circumstances;

(e)     whether any of the entity Defendants aided and abetted any of the other Defendants' breaches of fiduciary duties; and

(f)     whether the Class is entitled to injunctive relief and/or damages as a result of the wrongful conduct committed by Defendants; and if so, the proper measure of such relief and/or damages.

56.     To the extent Defendants take further steps to effectuate or perpetuate the Transaction, preliminary and/or final injunctive relief on behalf of the Class as a whole will be appropriate because Defendants have acted, or refused to act, on grounds generally applicable and causing injury to the Class.

## STATEMENT OF FACTS

### Background of BBC and Nell-1

57.     BBC is a Burlington, Massachusetts- based biotech startup corporation focused on developing and marketing orthobiologic products with NELL-1, described as its "proprietary platform technology," a valuable flagship product that is on the verge of prospering.

58.     BBC was founded in 2004 by Plaintiff Dr. Soo, Dr. Kang Ting, and Dr. Wu. According to BBC's website, MTF has historically been BBC's "major shareholder and primary funder . . ."[10]  According to BBC's filings with the SEC, it was incorporated in Delaware on October 18, 2007 under the name AFH Acquisition X, Inc.

59.     BBC's stated "goal" is to "offer patients superior safety with uncompromising efficacy relative to existing technologies." BBC advertises its "lead product" as

> a NELL-1 based bone graft substitute for spine fusion, targeting the rapidly growing orthobiologics market. . . . NELL-1 provides specific targeted regulation over bone regeneration in the presence of targeted osteogenic cells, as both demonstrated in the lab and through the use

---

[10] http://bonebiologics.com/investor-relations/ (last visited January 9, 2019)

of animal testing, unlike any other current therapy. It has been shown not to form bone when applied to non-osteogenic cells such as myoblasts (a type of embryonic progenitor cell that differentiates to give rise to muscle cells) nor does it induce adipogenesis (the formation of fat that can occur within the bone matrix often exhibited as cysts) that results in weaker bone.

**MISSION**

Our mission is to utilize the power of NELL-1 to improve clinical outcomes and reduce total health care delivery costs associated with spinal fusion. Bone Biologics is focused on bone repair and regeneration applications and is committed to exploring additional applications of the NELL-1 technology to enhance bone regeneration and repair in areas where the current options provide suboptimal patient outcomes.[11]

60.     NELL-1 is a powerful specific bone and cartilage reformation product, which provides regulation over skeletal tissue formation and stem cell differentiation during bone regeneration. ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████

61.     NELL-1 is the subject of fifteen (15) issued patents owned by UC Regents, with more than 175 claims,[12] covering molecular structure/composition, manufacturing process (NELL-1 protein expressed in mammalian & other systems), and "field of use" (use for promoting bone growth).   As mentioned above, BBC holds exclusive licenses through agreements with the UCLA TDG on behalf of UC Regents for the rights to develop and commercialize NELL-1 for spinal fusion applications.  UCLA TDG and the Company received

---

[11] http://bonebiologics.com/about/ (last visited January 9, 2019).

[12]   http://bonebiologics.com/wp-content/uploads/2018/08/BBLG-Investor-Presentation_August-2018.pdf (last visited January 9, 2019).

guidance from the FDA that NELL-1/DBX® will be classified as a combination product with a "device lead."

62.   Following the completion of several key milestones, in 2016 BBC expanded its "Field of Use" definition beyond just spinal fusion within the NELL-1 license agreement with UCLA TDG; consistent with that expansion, in June 2016 BBC entered into an option agreement for an exclusive license agreement with UCLA TDG for the worldwide application of the NELL-1 protein for both osteoporosis and trauma treatment.

63.   The spinal fusion market, estimated globally at almost $6 billion in 2015,[13] is projected to grow to $9 billion by 2023[14] and $11 billion by 2025.[15]   When BBC announced in 2016 that it had signed the option with UCLA to exclusively license NELL-1 in the global osteoporosis treatment market, that market was estimated at over $6 billion globally and projected to grow to $11 billion by 2025.[16]   The trauma treatment market was valued at $8 billion in 2015 and is projected to reach almost $16 billion by 2025.[17]

64.   The tremendous value of BBC, as reflected in the significant potential of NELL-1, is in the process of coming to fruition.   Given NELL-1's growing reputation and success, it is not surprising that Defendant Hankey and his affiliates rushed to force through the Transaction so

---

[13]   https://www.alliedmarketresearch.com/spinal-fusion-devices-market (last visited January 9, 2019).

[14]   https://www.globaldata.com/spinal-fusion-market-approach-9-billion-2023-technology-improves-says-globaldata/ (last visited January 9, 2019).

[15]   https://theglobalhealthnews.com/spinal-fusion-devices-market-rising-steadily-at-4-65-cagr-between-2017-and-2025/ (last visited January 9, 2019).

[16]   https://www.businesswire.com/news/home/20160614005367/en/Bone-Biologics-Announces-Signing-Option-License-Revolutionary (last visited January 9, 2019).

[17]   http://bonebiologics.com/2017/08/bone-biologics-adds-osteoporosis-and-trauma-indications-to-its-portfolio/ (last visited January 9, 2019) ; https://www.grandviewresearch.com/press-release/global-trauma-extremities-market   ;   http://bonebiologics.com/2017/08/bone-biologics-adds-osteoporosis-and-trauma-indications-to-its-portfolio/ (January 9, 2019).

that he could obtain a controlling stake in BBC earlier this year, before seizing such a windfall "on the cheap" became no longer be possible.

65.   An October 31, 2018 report in *The Wall Street Journal* stated that "[b]iotech companies have raised $5.56 billion in initial public offerings so far this year, placing 2018 on track to be one of the industry's best-ever for IPOs."[18]   The report, titled "Biotechs With No Drugs in Trial Are Raising Millions in IPOs," also stated, *inter alia*:

> Overall, through mid-October, U.S.-listed IPOs for some 52 drug developers have raised $5.75 billion in gross proceeds this year, third behind $8.19 billion raised in all of 2014 and $7.06 billion raised in 2000, according to inflation-adjusted data from Dealogic.
>
> Another database that some analysts point to shows that so far this year, 55 biotechs have raised $5.56 billion, trailing an inflation-adjusted $8.34 billion raised in all of 2000, $5.97 billion in 2014 and $5.74 billion in 2015. The database is maintained by Biogen Inc. Chairman Stelios Papadopoulos.
>
> In one of the strongest IPO markets of the past decade, some 209 companies have gone public on U.S. exchanges so far this year, raising a total of $56.6 billion, second most since 2008 on a year-to-date basis after the $88.92 billion, adjusted for inflation, raised by 249 companies in 2014, according to Dealogic.
>
> At least six more biotechs are on deck to go public before the year is out, including NGM Biopharmaceuticals Inc., whose lead drug, to treat a type of fatty liver disease, is in midstage studies. On Wednesday, shares of Orchard Therapeutics PLC and Twist Bioscience Corp. made their public debuts after the companies raised $200 million and $70 million respectively in IPOs.
>
> Early-stage biotechs—whose products aren't yet tested in human clinical trials or are tested only in early Phase 1 studies—represented 37% of biotech IPOs through the third quarter of 2018 and had an average market value of $535 million, according to Ravi Mehrotra, partner at investment bank MTS Health Partners. That is up from 35% of biotech IPOs with an average market value of $471 million in 2015.

---

[18]   https://www.wsj.com/articles/ipo-market-rewards-early-stage-biotechs-1540983601?emailToken=a463d28865f300c4c0c19bc6261223e6cMVD0n7Y/EGfLsDh0VMA5awnnGGYrJ/Nsy4lnkOrn9hyHEnW+m1ztrcbBd8jGnIRd9hgnhBVv6zbfA0UCYXQRWc7+MTrsRtQSfJslrjlcXs%3D&reflink=article_email_share (last visited January 9, 2019).

66.     The report in *The Wall Street Journal* also noted a number of specific examples, among them:

> **Allogene Therapeutics Inc.**, ALLO -2.35% founded last year, has no product revenue and is years away from getting a drug approved. Yet it raised $373 million earlier this month in one of the largest-ever initial public offerings for a biotech.
>
> **Rubius Therapeutics Inc.**, RUBY -1.68% in Cambridge, Mass., raised some $277 million in its July IPO, the second most of any biotech this year according to Dealogic, despite having not yet tested a drug in humans.
>
> **Homology Medicines Inc.**, FIXX -5.94% whose lead gene-therapy product won't start clinical trials until 2019, raised $166 million in its March IPO—three years after its founding—and now has a market value of more than $700 million.

67.     Just a few months ago, in an August 2018 presentation, BBC touted that it was "redefining bone regeneration with NELL-1, a secreted, osteoinductive protein whose expression controls skeletal ossification," that NELL-1 represented "A Potential Breakthrough in Bone Regeneration":

- BBC is developing a "next-gen osteopromotive product (NELL-1 + DBX) that is selective to bone."

- "Discovered through understanding craniosyntosis."

- "Platform technology with initial focus on spinal fusion."

- "Preclinical studies have shown equivalent efficacy and superior safety compared to rhBMP-2"[19]

68.     BBC's August 2018 presentation further highlighted the "Strong IP Barrier" favoring NELL-1, exemplified by the extensive patent coverage discussed above.[20]

---

[19] http://bonebiologics.com/wp-content/uploads/2018/08/BBLG-Investor-Presentation_August-2018.pdf (at p. 4) (last visited January 9, 2019).

69.     NELL-1 was also recently featured in the June 2018 edition of *Upward* Magazine, the "Magazine of the ISS [International Space Station] National Lab," in a report titled "Building Bones – Testing a New Osteoporosis Therapy with Mice in Microgravity."[21] The article reported, *inter alia*, that:

> When SpaceX CRS-11 launched to the space station last June, it carried 40 mice to the ISS National Lab for a mission aimed at improving treatment for the millions of people with osteoporosis back on Earth. The Rodent Research (RR)-5 mission successfully proved the robustness of a new potential osteoporosis therapy based on a naturally produced protein, NELL-1, and also led to significant improvements in the delivery of the therapy.
>
> *          *          *          *
>
> ANALYZING DATA AND LOOKING TO THE FUTURE
>
> The RR-5 team is still in the process of analyzing all the data, but preliminary results indicate the investigation was a success. Data from the hind limbs and vertebrae of the spaceflight mice showed significant bone loss from microgravity and a remarkable recovery by BP-NELL-PEG treatment.
>
> "We can unequivocally say that NELL-1 increases bone density in microgravity conditions, which is very exciting," [Dr. Soo] said. "This success demonstrates the robustness of the therapy to treat extreme bone loss."
>
> From here, the team plans to probe deeper into the molecular biology of the NELL-1 protein to gain a more detailed understanding of how the molecule works, while continuing to focus on the practical translational aspects of the therapy.

70.     In July of 2018, the NELL-1 project ("*Development of NELL-1 Bone-Growth Systemic Therapy*") was also selected as the winner of the *2018 International Space Station Innovation Award* in the *Biology and Medicine Category*.

---

[20]   http://bonebiologics.com/wp-content/uploads/2018/08/BBLG-Investor-Presentation_August-2018.pdf (last visited January 2, 2019).

[21]   https://upward.iss-casis.org/building-bones/ (last visited January 9, 2019).

71.     Defendants clearly recognize the value potential in NELL-1, far in excess of the bargain basement price Hankey paid for a controlling interest in BBC.  For example, the August 2018 presentation mentioned above offered a five-year revenue estimate of $400 million for BBC for the spinal fusion market alone, stating:

> Key Metrics - Market Metrics:
>
> - ~500K lumbar spine fusions WW
> - Multibillion market opportunity for spine indication
> - BBC 5yr revenue estimate >$400M (40% market penetration)[22]

72.     This August 2018 presentation is only one of the latest indications of the tremendous value potential of BBC, and follows many others which further highlight the gross under-valuation of the Company in connection with the Transaction, and the egregiously unfair treatment of the Class by the Defendants herein.[23]  For example:

(a)     A 2015 Company Presentation & Private Placement Offering prepared by BBC's President and Chief Technology Officer presented BBC's pre- and post- money valuation as approximately $60 million and $70 million, respectively (just based on the spinal fusion market).

(b)     A September 2015 Business Plan Discounted Cash Flow ("DCF ) analysis gave a present value for BBC of $99 million (based on the spinal fusion market alone).

(c)     An April 2016 presentation with a NELL-1 revenue model indicating $75 million by 2024 and almost $184 million by 2026 (again, based only on the spinal fusion market).

---

[22] http://bonebiologics.com/wp-content/uploads/2018/08/BBLG-Investor-Presentation_August-2018.pdf (at p. 12) (last visited January 9, 2019).

[23] Moreover, Biotech startups with similar features, size and trajectories as BBC have recently been valued at and sold for amounts reflecting consideration well in excess of the steep discount Hankey recently paid for the overwhelming stake in BBC.  For instance, one company, Shuttle Pharmaceuticals, Inc., a specialty pharmaceutical startup founded in 2012 focused on the development/commercialization of innovative drugs for sensitizing cancers to and protecting normal tissue from the effects of radiation, recently received valuations (including a DCF valuation) in the range of $229 million to $252 million.

(d)     An internal August 2016 Budget Analysis with an estimated "Worst Case Scenario" valuation for BBC of $123 Million (based on only the spinal fusion market).[24]

73.     Remarkably, none of this was discussed or disclosed in any of BBC's SEC filings in connection with the Transaction.  It is perhaps unsurprising that Defendants resisted obtaining any kind of valuation analysis from an independent financial advisor in connection with the Transaction, considering that BBC's own internal valuations consistently indicated values far in excess of the consideration paid by the Hankey Stockholders for their eighty-plus percentage stake in the deal.

**Events Leading Up to The Transaction**

**The Founders are Cut Out of the Loop and then Forced Out of the Company**

74.     Effective October 2, 2015, the Company and the Founders (Drs. Soo, Kang Ting and Dr. Wu), entered into a Letter Agreement pursuant to which the Founders agreed to deliver to the Company all past work product and past data related to NELL-1, in exchange for which BBC Company agreed to the future issuance of an aggregate of about 1.15 million shares of the Company's common stock (to be split equally among the three founders).

75.     On January 8, 2016, the Founders and the Company agreed to separate but substantially identical Professional Services Agreements with each of the Founders (the "FPSAs").  Pursuant to these Agreements, the Founders agreed to provide certain services to the Company, including providing strategic advice and strategic introductions to the Company's management team as well as specific services set forth on an Exhibit to each Agreement.  Under these Agreements each Founder was granted 10-year options (to vest in stages) to purchase 1,800,364 shares of the Company's common stock (corresponding to 4% of the Company's

---

[24] This same internal budget analysis contained "Best Case" and "Base Case" valuation scenarios of $308 million and $214 million, respectively.

outstanding common stock, on a fully diluted basis).  Additionally, each of the Founders were to

be paid an annual consulting fees in either cash or stock (at the Company's option).[25]

76.    The services to be provided by the Founders pursuant to the FPSAs consisted of:

**Description of Services**

. . . Over the term of this agreement, the Advisor will render services supporting and advising the Company with respect to the following initiatives:

1. Long term IP strategy, including providing input on IP / Patent approach – Patent Term Extension (PTE), Patent Term Adjustment (PTA), New Filings; guiding the Company's R&D focus, drive R&D direction, and build R&D programs (subject to mutually acceptable sponsored research agreements and receipt by Advisor from Company the necessary resources and authority to pursue IP and R&D programs recommended by the Advisor) to produce patent applications that if awarded will extend patent life of NELL-1 by at least 12 years; improve NELL-1 performance that if produced/purified/delivered properly by GMP protein contractor can increased Nell-1 half-life by 25% over current Nell-1 patents set to expire in 2019, and work closely with Company patent counsel to build a robust IP "wall" around the Company's product portfolio.

2. Pursuant to one or more sponsored research agreements to be entered into with Company on or before Jan 15, 2016, Advisor will support sponsored research services to be conducted on behalf of Company, concerning, among other things, basic NELL-1 characterization (e.g., bioactivity, mechanism of action, etc.), NELL-1 pipeline product work (e.g., chemical modification, targeted delivery, etc.), disease indication related work (e.g., materials, stem cells, diagnostics, wireless health continuous monitoring, etc.)

3. Review and implementation support of the third party partner, which the Company contemplates will be Diosynth (Raleigh, NC), including protein synthesis proposal, extending from the NELL-1 molecule characterization / formulation to pre-production

---

[25] On June 1, 2016, the Company agreed to issue to each Founder 10-year stock options to purchase 33,105 shares of the Company's common stock at an exercise price of $2.05 per share with an aggregate fair value of $192,906 as an adjustment to the FPSAs.

4. Review data on toxicity, immunogenicity, carcinogenicity and reproductive testing per agency guidelines across potentially three divisions (device, biologics, drugs)

5. Review data on animal testing following the Boden Model and to potentially include sheep (outside the model)

6. Review data on lyophilization and final manufacturing / assembly including DRM processes and specifications

7. Review data on final kit configuration to include components (vials, syringes, diluents, cannula, etc.), inner and outer trays and cartons, ship / drop, temperature stress testing

8. Review data on Clinical, Regulatory and Reimbursement strategies for selected indication(s), and Advisor shall provide real-time product evaluation, including providing confidential feedback of product concepts before farming out to contract labs.

9. Company Advanced Development Program - Developing novel product concepts that maximize the growth in company valuation by identifying products concepts and refining the product concepts to work synergistic with business development, IP strategy, regulatory timeline, manufacturing capability, marketing, and sales.

10. Company Acquisition Targets. Identification of Company third party acquisition targets, and also contribute to the technical due diligence process of evaluating technologies that will build value for Company.

11. Recruiting SAB, KOL, and consultant team. Advisor will use his/her connections to support the Company's recruitment of the most prominent scientists, visible clinicians, and productive consultants to support the growth of the Company. [26]

77.    In return, pursuant to the FPSAs, each of the Founders was granted ten-year options "to purchase 1,800,364 shares of the Company's common stock corresponding to 4% of the Company's outstanding common stock, on a fully diluted basis, at an exercise price of $1.59 per share, to vest in portions on an annual over a period of several years, and in full immediately

---

[26]https://www.sec.gov/Archives/edgar/data/1419554/000149315216006735/form8-k.htm ; and https://www.sec.gov/ Archives/edgar/data/1419554/000149315216006735/ex10-1.htm . (last visited January 2, 2019).

upon a change-of-control transaction.[27]  Additionally, pursuant to the FPSAs, beginning January 1, 2017 the Company was to pay each founder an annual consulting fee of $200,000 in cash or BBC common stock (at the Company's option).[28]

78.     After it assumed a controlling stake in BBC, MTF's reign came to be riddled with serious mismanagement of the Company, and an environment at BBC rife with lack of transparency and poor corporate governance.  As a result, MTF's relationships with the founders of the Company and AFH declined steadily over the years even as MTF increased its investments in BBC.

79.     For instance, after assuming a controlling stake and role in BBC, MTF consistently refused to share with the founders of the Company, Drs. Soo, Kang-Ting and Wu, information about the scientific progress of NELL-1.

80.     In addition to the FPSAs referenced above, the Founders, who had been involved in and guided the discovery and development of NELL-1 from the beginning, all had positions with the Company until early 2017.  Drs. Soo and Wu were Board members until April, 2017 and Dr. Ting was a member of the Company's Scientific Advisory Board.

81.     As such, the Founders understandably expected to be able to monitor the scientific progress of NELL-1, and have thorough and regular access to testing and other scientific data in connection therewith.   The Founders became very concerned about data

---

[27] "The shares subject to the Options will vest 25% on each of the first, second and third anniversary of the effective date and 12.5% on each of the fourth and fifth anniversary of the effective date. The options fully vest on a change of control of the Company, if the Company terminates the Agreement without cause or the Founder terminates the Agreement with cause."   https://www.sec.gov/Archives/ edgar/data/1419554/000149315216012301/form10-q.htm (at p. F-19) (last visited January 9, 2019).

[28] On June 5, 2016, the Company agreed to issue these Founders additional ten-year stock options to purchase 33,105 shares of BBC common stock at an exercise price of $2.05 per share, "as an adjustment to the Professional Services Agreements with each of the Founders dated January 8, 2016."   *Id.*  (last visited January 9, 2019).

integrity and having their names and reputations associated with data and results that they had not been able to sufficiently review or verify, particularly when they were expected by the Defendants to represent BBC and the strength of its product, business and operations publicly. The Founders felt they were expected – indeed obligated – to have access to and be able to scrutinize this information.  Yet the Founders were not allowed to see the raw data or test the NELL-1 material.  Accordingly, the Founders became increasingly uncomfortable at not being allowed access to sufficient data to verify or fully confirm it for themselves, and instead being forced to reply upon second- or third- hand reports.

82.    By October of 2016, BBC's lack of transparency with its own Founders and Board members remained.  At that point the Founders, in an email from Dr. Wu, tried to have the remedy the situation at least in part by proposing changes in the scientific reporting format and frequency with respect to BBC's reporting of the progress of NELL-1-related scientific development to the Founders.  Dr. Wu's October 26, 2016 email attached a detailed proposal to improve the situation which stated:

> Dear Board of Directors of Bone Biologics Corp:
>
> We are submitting this proposed science reporting format at the request of Bruce Stroever, Chairman of the BBC Board of Director. As discussed in multiple Board meetings, Board calls, committee calls, and individual discussions, we founders have repeatedly voiced our concerns of being uninformed of business and science decisions made by management. We are told that the management team needs significant freedom to independently operate on business decisions, and that we only need to know as much as other Board of Directors. We find this to be unsatisfactory with respect to business decisions that affect the founders directly and indirectly. Examples of undesirable consequences include the hiring scientific consultants, funding of needless scientific experiments that cost us time and money, and animal studies without proper scientific planning, could have been avoided if input from the founders were sought beforehand. We will keep this list short as they have already been presented to management and Board.

More importantly, the science calls have been largely frustrating and ineffective as they have been overly simplistic and conveyed through intermediaries who did not perform the actual work. When we asked for details, very little additional information is available, and no insights are available as to the scientific thinking involved, and the hypothesis moving forward. We are still waiting for answers to our questions on the Fuji data from June. We discussed the proper format several times but there is clearly no improvement. In response to the Board's recent request for proper reporting format in the science calls, we suggest the following.

1.  Complete data should be submitted a full 48 hours before the call, with enough depth that we can discuss mechanisms and potential issues. The results should be summarized in powerpoint, and the actual data should be provided in the original raw data format. Statistics, if used, should be justified. This allows BBC to have a collection of well justified scientific data that can be validated, analyzed, and fully understood. Giving us the "readers digest" version is not acceptable, especially when the presenter cannot answer our questions, and cannot followup with the information after promising to do so. A good start is to collect all the raw data and explanations that we have requested from the previous calls.

2.  Direct communication between Founders and the Fuji team and any subcontractors must be the primary mode of reporting. The consultants are great at presenting their slides, but they either cannot or refuse to answer our questions, and either cannot or will not get the answers from the source. We want to be able to ask the questions in real time directly, since we understand the full context and rationale of our questions. Given the financial constraints the company faces, the need to terminate some/all consultants is looming. When these consultants leave, it would take a lot of time and effort to re-compile the lost opportunity to gather the data as they come in, as a lot of information are currently completely hidden from founders. Therefore allowing founders to interface directly with Fuji, in particular, will allow us to help BBC reduce cost, de-risk the loss of knowledge and time, and preserve the value for our investment. The founders have the same obligations for confidentiality and certainly more loyalty to BBC than consultants who will leave the minute the funds run out. A good start is to schedule a meeting between the Fuji team and the founders, so that we can get an accurate assessment on the true status of protein manufacturing.

3. Scientific budget goes hand in hand with project management. Where did all the money go? We have raised quite a lot of money over the past year, but the latest term sheets at $1 conversion seems to suggest that company value has not increased. We don't know how we arrived at this state from the business side, but as we would like to have some insight and input into our scientific investments. A good start is to show updated expenditure summary since 1/1/16 of all BBC scientific investments, detailing contractual fees, budget, breakdown and scope of work for consultants' scientific projects. This will allow us to help BBC track and prioritize current and future science investment when we raise more funds.

We have waited patiently for management to improve the reporting system which has kept the founders at arm's length. This is not appropriate at best as it misrepresents a glaring problem to investors. We sincerely hope that this suggest format can finally address our concerns of being excluded.

83.  Dr. Wu's email sparked indignation and resistance from BBC's management, and in particular Defendant LaNeve.  LaNeve, despite claiming that BBC's "Management believes the founders are an important element of the company's 'asset mix'" and wanting to "accomplish a lot more together pulling in the same direction . . .,"  resisted, dissembled, claimed Dr. Wu should provide more "specifics," and finally tried to "kick the can down the road," so to speak, for discussion at some unspecified "future board meeting."

84.  The Founders' frustration understandably growing with this continued obfuscation, Dr. Soo then sent an email on October 28, 2016 stating:

**Re: science reporting**

Hi Steve

Since the founders are scientists, we deal in facts. ***The fact is that despite repeated requests, we have not been able to engage with the people generating the primary raw data. We are given data second or third hand that we cannot verify adequately or interrogate directly. The fact is that on our Oct 26th, 2016 call with Bill Coffin and Bruce Stroever, Bruce flat out stated that he did not see how the founder possibly could help in commercial protein production or characterization.  Although management***

29

*may make statements about wanting to engage the founders, the factual reality is that this has not happened*. The position articulated by Stroever sheds some light on why this has not happened.

*On a separate topic of deferred founders' compensation for the initial founders' agreement from Sept 2015, Stroever stated that the initial founders' agreement signed in Sept 2015 had no basis in his opinion--despite it being approved by the BBC board. Stroever said repeatedly on Oct 26th, 2016 call that the Founders were already paid through stock that they originally owned in the company, and should not expect any additional payments.* This sheds additional light on the delays in getting the contracts in place, and the fact that the contractual payouts have not been honored.

*Overall, the hostile statements made by Stroever as chair of the BBC board and the actual lack of founder engagement by BBC management, make it clear that engaging the founders is just lip service. The founders have never been truly engaged, and now we know that it is management's mandate to exclude the founders.* What Ben's asking for is completely reasonable given the state of the company.[29]

85.   BBC's reaction to the Founder's concerns was not to engage and communicate, but to escalate, retaliate and terminate.   In December of 2016, the MTF Defendants on BBC's Board began pressing the Founders with false and baseless accusations about the Founders' alleged violations of their duties and the FPSAs.   The Founders disputed these accusations, and took issue with the Company's statements in its draft SEC filings concerning these alleged violations.

86.   Specifically, on December 6, 2016 BBC's CFO, Ms. Walsh, circulated draft minutes of a November 9, 2016 Board meeting.   Those draft minutes contained language that made it clear to the Founders that BBC and the Defendants were retaliating against them for the criticisms and issues they had emphasized previously by falsely claiming the Founders were in violation of the FPSAs.   As Dr. Wu explained in a December 8, 2016 email:

---

[29] Emphasis added.

Dear BBC Board,

Thank you for the draft minute.  I would appreciate an explanation for the statement: "If the Founders do not provide completed work product described in the PSA then the Founders would be in breach of the agreement and would be given the option to supply information on the work that they have been undertaking according to the contract terms".   I repeat my 11/23/16 question to Steve that remains unanswered:  Can you please point me to the due date that is 11 months overdue per the PSA?  First of all, the PSA was signed in Jan 2016 for a term of 5 years. Second, the deliverable were absolutely contingent upon the company providing the necessary resources to accomplish the deliverables. Third, there were no specific due dates for deliverables.  Therefore Steve's absurd statement that the founders were 11 months overdue is insupportable.  This random, poorly thought-out attack on the founders came after our 10/26/16 letter to the Board delineating our concerns with scientific and business management of the company, and after our call with Bruce Stroever and Bill Coffin where we questioned the management team's performance, inability to raise any significant funds beyond the insiders, poor science reporting, and lack of transparency.  Then, Steve invents an 11 month overdue deadline, creates urgency, changes the rules after the fact, changes the due date, and will most likely serve as the judge and juror to determine if the founders are in breach. This constitutes a form of retaliation that is simply inconsistent with proper corporate governance.

With respect to the SRA, please clarify if the COI was the only obstacle towards developing an SRA that will allow the founders to carry out some of the deliverables described in the PSA.  The COI issue was news to the Founders.  Separately, it was our understanding from Bruce's email to the board that BBLG funds would run out Oct 15, 2016.  Subsequently, documents sent to the board suggest that the most recent $1.2M note requires winding down BBLG operations to complete existing ongoing studies and suspending founders consulting agreements.  We were told by Bruce that the funds would support only protein manufacturing – and that the founders are not qualified to contribute in that process.  This sudden change in interest to fund the SRA documented is in direct contrast with ALL prior written communications and previous board minutes that point to winding down.  Since the board minutes are the first time that we hear about starting new studies, how much funds are actually available for the SRA?   Neither the change in company direction nor the amount of funds have been communicated to the founders, yet the draft minutes make it appear that BBLG is waiting for us to complete the SRA.  Coincidentally, this abrupt U-turn occurs at the same time that

Steve invents the 11-month overdue deadline. This surprise is certainly consistent with my 10/26/16 letter to the Board regarding our concerns of being uninformed of business and science decisions made by management. This retaliation adds to the inappropriate pattern of mismanagement and constitutes a glaring problem to investors.

Despite these concerns, we have been very active in our own scientific activities and we are very are happy to supply information – after these questions are answered satisfactorily. Given the unprofessional and heavily biased manner that this is mismanaged, the Founders request an independent committee comprising of major shareholders to be involved in judging if the founders are indeed in breach. Steve is simply not qualified to handle this. Several board members have requested a board meeting or board call. On a side note, the draft minutes from the 11/9/16 board call contains incorrect information regarding the PSA and SRA that we can discuss then.

Best Regards,

Ben

87.     On December 13, 2016, the Company provided written notice to each of the Founders that it was terminating the Agreements for cause, effective on January 12, 2017, absent cure of supposed "material breaches" of the Agreements by the Founders. The Company and the Founders then began to engage in discussions concerning this issue and these alleged "material breaches."

88.     Thereafter, on or about March 23, 2017, BBC's CFO Deina Walsh circulated the Company's draft 10-K for the year ended December 31, 2016 to the Board (then including Plaintiff Dr. Chia Soo) for review and approval, which contained more inaccurate statements about there existing cause for the Company to terminate the FPSA. The Founders thereafter continued to engage in good faith attempts to understand and resolve the supposed issues raised by the Company, but the Company nevertheless terminated the Agreements effective April 8, 2017.

89.     As a result of their having been wrongfully accused of breaching the Agreements,

Dr. Soo and Dr. Wu resigned from BBC's Board effective April 13, 2017, and Dr. Ting resigned

as a member of BBC's Scientific Advisory Board on April 13, 2017, with a letter stating:

> Dear BBC Board,
>
> This is to let you know that all three Founders have been unilaterally terminated by Stroever without cause and without a vote from the full board.
>
> Despite agreement of the board to have management discuss with the Founders the conduct of the next set of pivotal large animal studies, this has not happened and the Founders have been kept in the dark.
>
> We do not agree with this manner of running the company from both a scientific and a corporate sense.
>
> Effective today, April 12, 2017, we (Ben and Chia) are resigning from the BBC Board —and all three of the Founders (Eric, Ben [Chu], and Chia) are resigning from the Scientific Advisory Board.
>
> Please take our information and publications off of the website. Eric, Ben, and Chia.

90.     The Founders were effectively improperly forced out of their positions and out of

the Company false and baseless allegations of misconduct and material breaches of the FPSAs.

This succeeded in removing what would surely have been substantial opposition not only to

MTF's domination and control of the Board, but the eventual Transaction, ensuring that MTF

and the Hankey Stockholders could smoothly effectuate their plan to transition control of the

Company to Hankey and his affiliates with limited or no internal director or significant

stockholder opposition to (or significant advance knowledge of) the Transaction.

**MTF Moves Limit its Further Funding Exposure But Still Protect the** ▮▮▮▮▮▮

91.     MTF conspired with, supported and voted its Board seats and 35% equity stake in

BBC in favor of the Reverse Split and the Transaction and handing Hankey control of the

Company.  MTF makes the specious and self-serving claim that it since it was supposedly treated "the same" as other BBC "minority" stockholders, its motives and actions must be beyond reproach.  This is not the case.

92.     Close scrutiny reveals that MTF in fact had significantly different and conflicting motives and interests from those of the Class in pursuing, supporting, and scheming with the Hankey Stockholders to engineer this change-of-control Transaction, which was to the great benefit of both the Hankey Stockholders *and* MTF, while severely detrimental to the Class.

93.     MTF, BBC's largest pre-Transaction stockholder (at approximately 35%) and largest funder, had invested over $12 million, and installed its designees in executive management positions and Board (including, pre-Transaction, both CEO and the Chairman).  As such, MTF was controlling stockholder of BBC prior to the Transaction.  MTF (alone and in conjunction with Hankey) clearly had the motive, opportunity and power to dominate and control the business and operational affairs of BBC, and freely exercised that power.

94.     As referenced above, MTF also owns and controls DBX®, a proprietary form of DBM.  Generally, DBM (demineralized bone matrix) is the most popular form of what is purported to be osteoinductive bone, and is the collagen matrix of allograft bone that remains after extensive processing that removes blood, cells, and inorganic minerals. Available in a variety of forms, DBMs carrier material provides texture and pliability to suit the recipient site and is used primarily as a "graft extender."   DBM has superior biological properties to undemineralised allograft bone; as a result of the demineralization process, DBM is more biologically active than undemineralized bone grafts.  Conversely, the mechanical properties of DBM are significantly diminished.

95.    DBX® is one of a range of DBM products currently approved by the FDA for clinical use.  However, MTF is very clear as its view of the extremely important and beneficial commercial ties between DBX® and NELL-1.[30] For instance, Defendants represent that BBC has

> developed a stand-alone platform technology through significant lab, small animal, large animal, and rhesus monkey research over more than ten years to generate the current applications across broad fields of use. The platform technology is UCB-1,[31] a proprietary skeletal specific growth factor used in combination with DBX®, a proprietary demineralized bone matrix from [MTF].  ***Together, with DBX®, or alone, Nell-1 provides regulation over skeletal tissue formation and stem cell differentiation during bone regeneration.***[32]

96.    BBC states on its website that :

> The global orthobiologics market is valued at approximately $3 billion in 2016 and growing at mid-single digit growth rates (Source: *Orthopedic Network News*). ***While the product is initially targeted at the spine fusion market, Bone Biologics believes the NELL-1/DBX fusion device's unique set of characteristics including target specific mechanism of action, efficacy, safety, and affordability position the product well for application in a variety of procedures, including***:

>> **Non-Union Trauma Cases** – While the majority of fractures heal without the need for osteosynthetic products, bone substitutes are used in complicated breaks where the bone does not mend naturally. The NELL-1/DBX fusion device is expected to perform as effectively as high-priced growth factors in this market

>> **Hip & Knee Revisions** – The use of bone substitutes in reconstruction surgery is generally limited to revision cases where the products are used to account for the significant bone loss that accompanies these cases. Hip and knee reconstruction for osteoporotic patients is a substantial opportunity for the NELL-1/DBX fusion device.

---

[30] http://bonebiologics.com/products/nell-1tcp/ (last visited January 10, 2019).

[31] UCB-1 is a commercial name for NELL-1 ("UCB" abbreviates "University of California BONE").

[32] http://bonebiologics.com/products/nell-1tcp/platform-technology/ (last visited January 10, 2019).

> **International Markets** – The company is currently focused on the domestic United States market, but recognizes the potential of international markets where specific country demographics may be similar to that of the United States.[[33]]

97.     As mentioned above, MTF has been one of BBC's major investors and its single largest provider of funding.  By 2017, MTF had invested approximately $12 million into BBC in total.  However, MTF's willingness to provide funding or further investments to BBC either reaching, or had reached, its end.[34]

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████

98.     In other words, MTF has been eager, if not desperate, for another large *but friendly* investor to take over as the lead financier of BBC/NELL-1.  The Hankey Stockholders and the Transaction provided the solution to this problem, by providing future funding as well as the needed safeguard going forward for the flame of renewed life and potential increased profitability that BBC/Nell-1 present for DBX®.

---

[33] http://bonebiologics.com/products/nell-1tcp/market-overview/ (last visited January 9, 2019) (Emphasis added).

[34] Upon information and belief, while MTF makes investments in promising biotech startup companies, its funding commitment in such circumstances, on average, are typically approximately $2 million, which had been far exceeded with respect to BBC.



99.    While historically DBX was quite successful for MTF, over the past several years its future potential has been considered to have waned.  ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████

100.    Statements by certain individual Defendants just prior to the Transaction confirmed this.  For instance, Defendant Stroever openly admitted in 2018, prior to the Transaction, that MTF was not particularly concerned with BBC's stock price going forward, or, at least directly, with its valuation going forward.  In June of 2018, Defendant Stroever directly admitted as much in face-to-face conversations with Plaintiff Heshmatpour.  During one such conversation on June 2018, Stroever admitted to Plaintiff that MTF is not particularly concerned with maximizing its direct equity investment in BBC, or with BBC's stock price.  Instead, MTF was more concerned with protecting the renewed potential for DBX® offered by NELL-1 and BBC going forward.

101.    Moreover, at a Board meeting in May of 2018, just prior to the commencement of the Transaction, Defendant Stroever stated that MTF was not particularly concerned with BBC's



stock price or MTF's near-term investment in the Company, and was much more concerned with protecting the increased potential that NELL-1 represented for DBX®.

### Defendants Dissuade Alternative Investors in BBC

102.    Moreover, whenever Plaintiffs sought to bring in potential alternative financing for BBC in late 2017 and 2018, they were met with unreasonable resistance from Stroever and Hankey.  For instance, on several occasions in late 2017 and early 2018 Plaintiff Heshmatpour approached Stroever and/or Hankey to connect them with potential alternative funding sources and investors, and every time Plaintiff Heshmatpour was met with excuses, roadblocks, deflection and lackluster efforts (at best) and a failure to cooperate or meaningfully assist in cultivating these potential alternative funding sources.  Specifically, Mr. Heshmatpour brought in multiple different potential financing sources in the 18 months or so leading up to the Transaction.

103.    Mr. Heshmatpour (either by himself or through associates) brought in multiple potential financing sources from 2016 to 2018, ████████████████████████████████ ████████████ ████████████████ ████████████████.  In every instance, however, these potential investors balked at proceeding due to the intransigence and stonewalling of BBC's management and the MTF/Hankey dominated Board.  Either BBC's Board/management made excuses to refuse to engage or even explore the opportunity at all for superficial reasons, such as the interest being too preliminary or not specific enough, refusal to provide any due diligence whatsoever or sign an NDA which would allow such due diligence.



104.    In hindsight, the reasons for Defendants' continued resistance to exploring other alternatives is clear: they were planning their ambush of the Class members with the Transaction

**MTF and Hankey Plan and Execute the Transaction for Hankey to Seize a Majority Stake in BBC "On the Cheap"**

105.    The Plaintiffs initially got wind of the Defendants' surreptitious plans to force through the Transaction in May of 2018, just weeks before it was actually executed.   Through Mr. Heshmatpour, Plaintiffs (who at that point collectively represented at least 25 to 30% of BBC's outstanding shares) promptly requested information about the specifics of any deal being negotiated, and copies of the deal term sheet.   Defendants stonewalled and dissembled, first claiming that the definitive agreement was still being developed and the term sheet would be shared when completed, but later refusing to disclose due to supposed "confidentiality obligations" (despite Plaintiffs' willingness to sign an NDA).   Defendants' stalling persisted through the execution of the Transaction.

106.    On June 12, 2018, Bone Biologics filed a Form 8-K filed with the U.S. Securities and Exchange Commission ("SEC") (the "June 12, 2018 8-K"[40]) disclosing for the first time that BBC and HC had entered into a Securities Purchase Agreement ("Purchase Agreement") the day before, June 11, 2018.   The June 12, 2018 8-K stated that under the Purchase Agreement, HC agreed to purchase up to 3,869,979 shares of BBC Common Stock at a purchase price of $1.00 per share, and up to $2 million in principal amount of a convertible secured Note.[41]   The June 12, 2018 8-K further disclosed, for the first time, that the closing of the Purchase Agreement was

---

[40]    The  Report  was  actually  dated  June  11,  2018.    https://www.sec.gov/Archives/edgar/data/1419554/000149315218008518/form8-k.htm  (at p. 1) (last visited January 9, 2019).

[41] The June 12, 2018 8-K also stated, in part, that the Note was convertible into shares of BBC common stock at the option of the holder at $1.00 per share, and was secured by an interest in all BBC assets and a pledge of collateral shares in an amount sufficient to maintain a loan-to-value ratio of no greater than fifty percent (50%).

"conditioned on the completion of" the Reverse Split at a ratio of 1 for 10 of the Company's outstanding common shares.

107.    However, the June 12, 2018 8-K gave no indication at all that the Reverse Split, including both the Board vote and the majority stockholder vote thereon, had **already taken place** four days ago, on June 8, 2018.  Thus, unbeknownst to Plaintiffs or the Class, by June 12, 2018, the Reverse Split "condition" to the Purchase Agreement was already a *fait accompli*.

108.    The same day (June 12, 2018), the Defendants filed a Preliminary Schedule 14C with the SEC, stating that they had already commenced the Reverse Split.  According to this Preliminary 14C (and the Final Schedule 14C that was not filed until two weeks later, on June 25, 2018):

> This Information Statement is being furnished to you to inform you that holders of shares representing a majority of the voting power of shares of our securities have adopted, by written consent, resolutions authorizing us to take the following action (the "Proposal"):
>
> Reverse Split. To approve and adopt an amendment to the Company's Certificate of Incorporation to approve a reverse split (the "Reverse Split") of the Company's outstanding common stock at a ratio of 1 for 10.
>
>                 \*     \*     \*     \*
>
> The approval of the Proposal requires the consent of the holders of a majority of the voting power of the Common Stock entitled to vote. ***The Delaware General Corporation Law generally provides that any action required to be taken at any annual or special meeting of stockholders of a corporation, or any action which may be taken at any annual or special meeting of such stockholders, may be taken without a meeting, without prior notice and without a vote, if a consent or consents in writing, setting forth the action so taken, shall be signed by the holders of outstanding stock having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all shares entitled to vote thereon were present and voted.***

> *In order to eliminate the costs and management time involved in soliciting and obtaining proxies to approve the Proposal and in order to effectuate the Proposal as early as possible in order to accomplish the purposes of the Company as hereafter described, the [Board] voted to utilize, and did in fact obtain, the written consent of the holders of a majority of the voting power of the Company. Approval of the Proposal was obtained as of June 8, 2018 by written consent of the holders of shares representing 66.28% of the voting power.*[[42]]

109. At the same time, both the June 12 Preliminary and the June 25 Final Schedule 14C filings made the misleading representation that they were providing "NOTICE OF ACTION TO BE TAKEN WITHOUT A MEETING"; in fact, the action had, and certainly for all intents and purposes, already been taken.

110. On June 25, 2018, BBC filed a Final Schedule 14C with the SEC stating that as a result of the Reverse Split, each common stockholder in BBBC owns or will own a reduced number of shares of BBC common stock and that, without taking into account fractional shares (which were to be rounded up to the nearest whole share), the aggregate number of outstanding shares of common stock was reduced from 44,537,403 shares to 4,453,740 shares.

111. On July 19, 2018 BBC filed a Report on Form 8-K with the SEC disclosing for the first time that "[e]ffective July 16, 2018, the Company and [HC] have entered into an amendment . . . to the [Purchase Agreement] dated as of June 11, 2018 . . . providing for a $2 million credit facility from HC to the Company (in lieu of the earlier announced $2 million loan), and announcing the issuance of shares to HC under the Purchase Agreement.

112. Moreover, the Company's July 19, 2018 Form 8-K announced for the first time that as a result of the Transaction, "Don Hankey, . . . , acquired control of the Company," and would not only be given a Board seat but would also immediately assume the positions of

---

[42] https://www.sec.gov/Archives/edgar/data/1419554/000149315218008521/formpre14c.htm (at pp. 2-3) (Emphasis added) (last visited January 9, 2019). *See also* https://www.sec.gov/Archives/edgar/data/1419554/000149315218009146/def14c.htm (at pp. 2-3) (last visited January 9, 2019).

director and Chairman of the Board of BBC.  Hankey thus was able to obtain an overwhelming majority interest in the Company for approximately a value of approximately $5 million, representing only a small fraction of what that interest was and is actually worth.  A fairness opinion conducted by an independent financial advisor would have confirmed as much, which is why Defendants' refused to commission one.

**Defendants Failed to Provide Even Basic Procedural Protections for the Class**

113.    Defendants failed to take even the most basic steps of obtaining a fairness opinion or retaining an outside financial advisor, much less establishing a special committee of independent directors to actually negotiate with Hankey or vet the terms of the Transaction.  Nor did the Defendants require a "majority of the minority" independent stockholder vote provision to ensure that the Class's interests were protected in this heavily conflicted change-of-control Transaction.  Indeed, the Defendants failed to even provide prior notice to the Class that decisions and votes critical to the Transaction were taking place, hiding behind the technicality that since they supposedly had enough votes anyway, no prior notice was needed.

114.    The Board failed to obtain a fairness opinion or valuation on the Transaction from an independent financial advisor or investment banking firm, claiming that it was a needless expense and that any such opinion or valuation would be irrelevant anyway, and anything Hankey was willing to pay under the circumstances must be fair and represent fair value.  However, multiple other analyses, both before and after the Transaction, confirm otherwise.  *See supra* at ¶¶ 71-72.

115.    Defendants' failure to obtain a fairness opinion with respect to the Transaction vis-à-vis the Plaintiffs and the Class is indefensible, given the massive potential commercial value that Defendants themselves recognize in NELL-1 and in BBC.  Just a few years ago, in

2015, when BBC's exclusive license with UCLA as to NELL-1 was limited only to the spinal fusion market, Defendants themselves estimated BBC's values in the range of $100 million based on a discounted cash flow (DCF) analysis. Current valuation ranges are exponentially higher. These value indicators for BBC which point to the gross unfairness of this Transaction which gave Hankey overwhelming control and an 84% stake in the Company for about $5 million.

116.   None of the Plaintiffs voted in favor of (or were even give proper notice of or an opportunity to vote on) the Reverse Split until it was already a *fait accompli*, and had already approved by the Board and a secretly organized stockholder vote in which an alleged majority of conflicted stockholders had already approved it. The Board members who reportedly voted in favor of the Transaction were Brett Hankey (designated to the Board by HC), and Stroever, LaNeve and Booth (all designated to the Board by MTF).

117.   Remarkably, Brett Hankey did not abstain from the vote in favor of the transaction with HC, even though he was and is clearly an interested stockholder and an interested director in connection with the Transaction, considering his extensive and deep ties to Don Hankey and HC.

118.   In sum, MTF, Hankey and his affiliates controlled the voting processes as well as the vote outcomes in favor of the Transaction and the Reverse Split, choreographing the results for the favorable results and benefit of interested parties, to the detriment of Plaintiff and the Class.

119.   The Board and the other Defendants failed to take any steps whatsoever to ensure that the interests of Plaintiffs and the Class were adequately protected in the context of a clearly conflicted transaction. Not only did the Defendants fail to take such steps, they instead took

affirmatively hostile actions which undermined and damaged the interests of the minority stockholder Class in favor of their own by ramming through the unfair and inadequate Transaction in violation of their fiduciary duties.

120.    On the other hand, Defendants made sure to protect their own and their affiliates' interests in advancing this ambush-style Transaction, considering the unique and exclusive benefits obtained by MTF and Hankey as a result of the Transaction, and the fact that MTF's and HC's designees/affiliates on BBC's management team and the Board remained largely entrenched in their positions post-Transaction.

121.    In sum, the Transaction represented the successful culmination of corrupt conspiracy and self-dealing by BBC's controlling stockholders, MTF and Hankey.  Hankey and his affiliates obtained a controlling equity interest (eighty-plus percent) in BBC and the accompanying substantial increased upside potential; and MTF received the assurance of the renewed/increased profit potential of DBX® going forward.  Both achieved their goals and derived substantial benefits not enjoyed by the Company's other, minority stockholders (the Class), causing damage to the Class members in doing so.

**The Transaction Violated the Terms of the May 7, 2014 Letter of Intent between BBC, MTF and AFH**

122.    By forcing through the flawed and unfair Transaction, and handing 80% control of the Company to the Hankey Stockholders, the MTF Defendants and BBC also Violated the terms of a May 7, 2014 Letter of Intent ("LOI") between MTF, BBC and AFH.[43]  That LOI provided, among other things, that:

> • A provision that AFH and its affiliates (including Mr. Heshmatpour) (termed the "AFH Group") would retain common shares in BBC equal to a fully

---

[43]    https://www.sec.gov/Archives/edgar/data/1419554/000149315216007446/ex10-1.htm   (last   visited January 9, 2019).

diluted ten percent (10%) interest in the issued and outstanding common stock of the Company (subject to adjustment should AFH's percentage ownership exceed 10% on a fully diluted basis).[44]

- A provision titled "Right to Appoint Directors" mandating that BBC's Board would consist of "up to" nine members, three each of which were to be selected by AFH and MTF, respectively, with one member to be appointed by the Founders "and current minority shareholders" and the remaining two directors, "if they are to be appointed by the Board," to be "independent and selected by the Company." Moreover, each of AFH and MTF had the right under the LOI to appoint a non-voting "observer status" Board member with the right to attend all Board meetings and receive all Board communications.[45]

123. The Transaction violated both of these provisions of the LOI, by diluting AFH's interest to below the designated threshold, and by depriving AFH of the ability to appoint its proper share of directors to BBC's Board that it would have enjoyed had its BBC ownership interest not been severely diluted and reduced by the Transaction.

124. As a result, the Transaction also improperly destroyed the possibility of any proper corporate governance checks and balances to be put in or remain in place by the LOI by handing a controlling interest to the Hankey Stockholders.

**The Company's SEC Filings in Connection with the Transaction Were Materially False and Misleading.**

125. The Company's SEC filings in connection with and related to the Transaction (including, *inter alia*, the Reverse Split) were materially false and misleading, containing a number of material false and misleading statements and making material omissions.

126. The Company's SEC filings in connection with the Transaction were materially false and misleading in that they failed to disclose any information concerning the Company's

---

[44] https://www.sec.gov/Archives/edgar/data/1419554/000149315216007446/ex10-1.htm (at p. 7) (last visited January 9, 2019).

[45] https://www.sec.gov/Archives/edgar/data/1419554/000149315216007446/ex10-1.htm (at p. 9) (last visited January 9, 2019).

true value, which was well in excess of the consideration given in connection with the Transaction, including, among other things, the fact that numerous internal valuations had been conducted which showed as much, as set forth for example in ¶¶ 71-72 above.

127.    BBC's SEC filings were also false and misleading for failing to provide an independent fairness opinion or independent valuation of the Company by an independent financial advisor in connection with the Transaction, which would have indicated the true (and much higher) value of the Company, and also for not disclosing the true reasons why no such independent opinions/valuations were obtained.

128.    The June 25, 2018 Schedule 14C represented that the Reverse Split "affect[ed] all of [BBC's] common stockholders uniformly . . .."[46] This was materially false and misleading because it failed to explain that as a result of the re-pricing of the prior convertible notes issued to HC, combined with the Purchase Agreement and additional note, the Hankey Stockholders would increase their percentage ownership of the Company enormously, to over eighty percent 80% of BBC, thereby obtaining control and simultaneously severely diluting the other minority stockholders' (*i.e.,* the Class) interests.

129.    The claim that all of the stockholders would be treated or affected "uniformly" was a particularly egregious and misleading misrepresentation in light of the overall Transaction and all of its parts, including the Reverse Split.  This self-serving statement simply is not borne out by the circumstances or the actual results and disparate and inordinately negative impact of the Transaction on the minority BBC stockholders in the Class.

130.    Moreover, as mentioned above, the June 12, 2018 Form-8-K gave no indication at all that the Reverse Split (including both the Board vote and the majority stockholder vote

---

[46] https://www.sec.gov/Archives/edgar/data/1419554/000149315218009146/dcf14c.htm   (at p. 5) (last visited January 10, 2019).  The June 12, 2018 Preliminary Schedule 14C made this representation as well.

thereon), had already taken place four days ago, on June 8, 2018, and thus by June 12, 2018, the Reverse Split "condition" to the Purchase Agreement was already a *fait accompli*.

131.    At the same time, the June 12 Preliminary Schedule 14C (as well as the Final Schedule 14C filing two weeks later) made the misleading representation that they were providing "NOTICE OF ACTION TO BE TAKEN WITHOUT A MEETING"; in fact, the pertinent action had, certainly for all practical purposes, already been taken.

132.    On July 19, 2018 BBC filed a Report on Form 8-K with the SEC disclosing for the first time that "[e]ffective July 16, 2018, the Company and [HC] have entered into an amendment . . . to the [Purchase Agreement] dated as of June 11, 2018 . . . providing for a $2 million credit facility from HC to the Company (in lieu of the earlier announced $2 million loan), and announcing the issuance of shares to HC under the Purchase Agreement.

133.    Moreover, the Company's July 19, 2018 Form 8-K announced for the first time that as a result of the Transaction, "Don Hankey, . . . , acquired control of the Company," and would not only be given a Board seat but would also immediately assume the positions of director and Chairman of the Board of BBC.

134.    Although the Transaction is contingent on a Rights Offering to existing stockholders to participate in the securities purchase, no offering memorandum has yet been filed with the SEC.

135.    In addition, the June 25, 2018 Schedule 14C incorrectly stated that Mr. Heshmatpour has voting and investment control over 2,742,393 shares of the Company owned by H&H Funding LLC.  Mr. Heshmatpour does not have voting or investment control over any of the shares of the Company held by H&H Funding LLC.

136.    The Company's SEC filings in connection with the Transaction failed to disclose Don Hankey's ownership interest in, and control of, H&H Funding LLC.  As the sole Manager of H&H Funding LLC, Don Hankey is the sole member of H&H Funding LLC with voting and investment control.

137.    There are also discrepancies between the information about the Transaction provided in the June 8-K and the Schedule 14C filed on June 12, 2018.  Specifically, the June 8-K states that the proposed convertible secured note (i.e. the Note) will bear interest at the greater of the Prime Rate or 8.5% per annum.  However, the Schedule 14C states that the Note will bear interest and be payable on a monthly basis at a rate equal to the greater of (i) the Prime Rate plus 4%, or (ii) 8.5%.  There is a material difference between 'Prime Rate" and "Prime Rate plus 4%."

138.    The Rights Offering dated June 25, 2018, mailed to the Company's stockholders, failed to disclose the Conversion Price Amendment.

**The Company Amended the Transaction on the Closing Date.**

139.    On July 19, 2018, the Company filed a Form 8-K stating that effective July 16, 2018, the closing date for the Transaction, the Company and Hankey Capital had entered into an Amendment to the Purchase Agreement to provide that "in lieu of loaning the Company $2,000,000 at the closing, Hankey Capital will provide a credit facility to the Company of $2,000,000 to be drawn down by the Company upon notice to Hankey Capital" (the "July 8-K").

140.    The July 19, 2018 8-K states that "[e]ach draw will be evidenced by a convertible secured note on the same terms" as previously disclosed in the June 8-K.

141.    The stated purpose of the Amendment is "to reduce the interest expense to the Company," but the Amendment does not ensure that the interest expense to the Company will in fact be reduced because there is nothing preventing the Company from drawing down the full

$2,000,000 all at once, which would cause the Company the same interest expense as previously contemplated.

142.   The July 19, 2018 8-K also makes additional disclosures, including an acknowledgement that Don Hankey is the sole manager of the shares held by H&H Funding LLC.

143.   Given that the Amendment to the Purchase Agreement discussed in the July 19, 2018 8-K materially changes the terms of the Rights Offering, the Rights Offering should have been amended and offered to the stockholders in advance of the close of the Transaction.

144.   As controlling stockholders of the Company, MTF and Hankey (and his affiliates) owed and owe fiduciary duties to the Company's other, minority stockholders (including Plaintiffs and other Class members) not to use their controlling positions and influence to wrongfully benefit themselves or others at the expense of the Company or its other minority stockholders.

145.   Because MTF and Hankey and his affiliates stood on both sides of the Transaction and not only allowed the Transaction to proceed, but set it in motion and forced and ensured its approval and consummation (freezing out Plaintiffs and the Class in the process) these Defendants bear the burden of proving the entire fairness of the Transaction, including all aspects of its negotiation, structure, price and process.

146.   For these and other reasons, as set forth above, Defendants have violated their fiduciary duties of loyalty, good faith, fair dealing, candor, and due care (and/or aided and abetted those fiduciary breaches) and also breached federal securities law, as set forth herein. Accordingly, Plaintiffs seek relief for their harm in the form of injunctive relief and/or money damages as a result of the violations of law alleged herein.

## COUNT I
### Violation of Section 14(c) of the Securities
### Exchange Act of 1934 and Rule 14c-6

147.    Plaintiffs incorporate by reference and re-allege each and every allegation
contained above, as though fully set forth herein.

148.    As detailed above, Defendants caused to be issued, and participated in the
issuance of materially false and misleading written statements and material omissions to
stockholders that were contained in the Definitive Information Statement filed pursuant to
Section 14(c) of the Securities Exchange Act of 1934 (the "Schedule 14C").

149.    In issuing the Schedule 14C containing misrepresentations and omissions in
violation of Section 14(c) of the Exchange Act as set forth specifically above, Defendants have
misled investors in violation of the federal securities laws.

150.    Plaintiffs, on behalf of the Company, seek injunctive, declaratory and
equitable relief for the Defendants' violations of Section 14(c) of the Exchange Act.

## COUNT II
### Breach of Fiduciary Duty Against all Defendants

151.    Plaintiffs incorporate by reference and re-allege each and every allegation
contained above, as though fully set forth herein.

152.    As members of the Board of Directors, each individual defendant owed each
plaintiff and the Company the fiduciary duties of care and of loyalty.

153.    As a controlling shareholder, MTF owed each plaintiff the fiduciary duties of
care and of loyalty.

154.    As explained above in detail, Plaintiffs have personal knowledge that Defendants did not fulfill their fiduciary duties owed to Plaintiffs to take steps to ensure that they received the best price for the change in control.

155.    Defendants took no steps to ensure that the transaction was fair to the minority interest holders.

156.    No fairness valuation was undertaken.

157.    Upon information and belief, Don Hankey presented the terms of the Transaction and the Board agreed to those terms as presented.

158.    Don Hankey and his affiliate, HC, did not pay a premium for obtaining control of the Company.

159.    The Board did not present other options for financing or investment to the stockholders.

160.    The Transaction was not approved by a disinterested Board, a majority of disinterested directors or a special committee of disinterested directors.

161.    **The** Transaction was not approved by a majority of disinterested stockholders.

## <u>COUNT III</u>
### Aiding and Abetting Breach of Fiduciary Duties Against all Defendants

162.    Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

163.    Defendants have acted and are acting with knowledge of, or with reckless disregard to, the fact that their co- Defendants are in breach of their fiduciary duties to the Class, and have participated in such breaches of fiduciary duties.

164.   Moreover, each of the Defendants have knowingly aided and abetted their co-Defendants wrongdoing alleged herein.  In so doing, they rendered substantial assistance in order to effectuate their co-Defendants' plan to execute and/or consummate the Transaction in breach of their fiduciary duties.

165.   As a result of the unlawful actions of the Defendants herein, Plaintiffs and the other members of the Class will be irreparably harmed in that their interests in BBC have been improperly and unfairly diluted, and as a result they will not receive the true value for BBC assets and business.  Unless their actions are enjoined by the Court, each of the Defendants will continue to aid and abet their co-Defendants' breaches of their fiduciary duties owed to Plaintiffs and the members of the Class.

166.   As a result of Defendants conduct, Plaintiffs and the other members of the Class have been and will be damaged in that they have been and will continue to be improperly and unfairly diluted as a result of the Transaction be prevented from obtaining a fair and reasonable price for their BBC shares.

167.   Plaintiffs and other members of the Class have no adequate remedy at law.

**COUNT IV**
**Rescission of the Reverse Stock Split, Except as to MTF**

168.   Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

169.   The Reverse Stock Split was not approved by a special committee of disinterested directors or a majority of disinterested stockholders and, thus, was not properly authorized.

170.   Accordingly, the Reverse Stock Split must be rescinded.

<u>COUNT V</u>
**In the Alternative, Rescissory Damages Against All Defendants, except as to MTF**

171.   Plaintiffs incorporate by reference and re-allege each and every allegation contained above, as though fully set forth herein.

172.   The Reverse Stock Split was not approved by a special committee of disinterested directors or a majority of disinterested stockholders and, thus, was not properly authorized.

173.   If the Court is unable to rescind the Transaction, in the alternative, Plaintiffs are entitled to rescissory damages.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury as to all claims so triable.

Dated: February 8, 2019

> *PLAINTIFFS AFH HOLDING & ADVISORY, LLC, AMIR HESHMAPOUR, STEVE RICHARDS, AND DR. BESSIE (CHIA) SOO*
>
> **By: Their Attorneys**
>
> **ANDRUS WAGSTAFF, PC**
>
> */s/ Kimberly A. Dougherty*
> Kimberly A. Dougherty
> BBO# 658014
> ADRUS WAGSTAFF, PC
> 19 Belmont Street
> South Easton, MA 02375
> Direct:  (508) 230-2700
> Toll Free: (866) 795-9529
> Facsimile: (303) 376-6361
> kim.dougherty@andruswagstaff.com
>
> And

**MILBERG TADLER PHILLIPS GROSSMAN
LLP**
Kent A. Bronson
*(to be admitted pro hac vice)*
One Pennsylvania Plaza, Suite 1920
New York, NY 10119
Telephone:  (212) 594-5300
Facsimile: (212) 868-1229
kbronson@milberg.com

*Attorneys for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing First Amended Class Action Complaint will be sent via

electronically to all Defendants, and by hand-delivery to the Court's Chambers.

*/s/ Kimberly A. Dougherty*
Kimberly A. Dougherty